
EXHIBIT A

| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| --- | --- |
| | SUPERIOR COURT DIVISION |
| MOORE COUNTY | 13 CvS 13CV00455 |

The Estate of RONALD H. ARMSTRONG, )
by and through his Administratrix, )
JINIA ARMSTRONG LOPEZ, )
                                             )  **COMPLAINT**
                                             )  (Jury Trial Demanded)
                Plaintiff, )
v. )
)
THE VILLAGE OF PINEHURST; )
OFFICER JERRY MCDONALD in his )
official and individual capacity; OFFICER )
TINA S. SHEPPARD in her official and )
individual capacity; OFFICER ARTHUR )
LEE GATLING, Jr. in his official and )
individual capacity; and TASER )
INTERNATIONAL, INC., )
)
                Defendants. )

        COMES NOW, the Plaintiff, by and through counsel, complaining of the Defendants, alleging the following:

1. This is an action seeking legal and equitable relief under the common law of North Carolina and 42 USC § 1983 from the wrongful acts and omissions of the Defendants that proximately caused the death of Ronald H. Armstrong.

2. Jurisdiction is proper in this Court as the cause of action arose in Moore County, North Carolina and the Plainitff, as Administratrix of Ronald H. Armstrong's Estate, seeks damages in excess of Ten Thousand dollars ($10,000.00) on each of her claims. Jurisdiction is also properly invoked pursuant to N.C. Const. Art. IV, §12 and N.C. Gen. Stat §§ 7A-3, 7A-240, and 7A-243. The Superior Court has jurisdiction over the constitutional claim.

## PARTIES

3. Ronald H. Armstrong (herein referred to as "Mr. Armstrong"), was a citizen and resident of Moore County, North Carolina.

4. At all times complained of herein, Mr. Armstrong was disabled, having been adjudicated as such due to mental disabilities.



5. The Plaintiff, Jinia Armstrong Lopez, is the sister of Mr. Armstrong, who died on April 23, 2011. She is the Administratrix of Mr. Armstrong's estate and is a citizen and resident of Moore County, North Carolina.

6. The Defendant, The Village of Pinehurst, is a municipal corporation or city as defined by N.C.G.S. § 160-A-1(2). At the time of the events alleged herein, the Village of Pinehurst maintained and was legally responsible for the administration of the Pinehurst Police Department. The Defendant, Village of Pinehurst, has waived its governmental immunity from the tort claims of this suit by purchase of liability insurance as provided by N.C.G.S. § 160-A-485 and is liable under the doctrine of *respondeat superior* as to each of the state common law claims against Defendants McDonald, Sheppard, and Gatling.

7. The Defendant, Jerry McDonald (hereinafter referred to as "Defendant McDonald") is, upon information and belief, a citizen and resident of Moore County. At the times alleged herein, he was a duly sworn law enforcement officer and public official employed by the Pinehurst Police Department and was acting within the course and scope of his employment.

8. Defendant McDonald is sued in both his individual and official capacities. The Village of Pinehurst has waived immunity as to the official capacity claim. On the individual capacity claim, Defendant McDonald's actions described herein were grossly negligent, malicious, wanton, willful, and/or done with reckless disregard for the rights of others.

9. The Defendant, Tina S. Sheppard (hereinafter referred to as "Defendant Sheppard") is, upon information and belief, a citizen and resident of Moore County. At the times alleged herein, she was a duly sworn law enforcement officer and public official employed by the Pinehurst Police Department and was acting within the course and scope of her employment.

10. Defendant Sheppard is sued in both her individual and official capacities. The Village of Pinehurst has waived immunity as to the official capacity claim. On the individual capacity claim, Defendant Sheppard's actions described herein were grossly negligent, malicious, wanton, willful, and/or done with reckless disregard for the rights of others.

11. The Defendant, Arthur Lee Gatling, jr. (hereinafter referred to as "Defendant Gatling") is, upon information and belief, a citizen and resident of Moore County. At the times alleged herein, he was a duly sworn law enforcement officer and public official employed by the Pinehurst Police Department and was acting within the course and scope of his employment.

12. Defendant Gatling is sued in both his individual and official capacities. The Village of Pinehurst has waived immunity as to the official capacity claim. On the individual capacity claim, Defendant Gatling's actions described herein were grossly negligent, malicious, wanton, willful, and/or done with reckless disregard for the rights of others.

13. The Defendant, TASER International, Inc., (hereinafter referred to as "Defendant TASER") is a Delaware Corporation with its principal place of Business in Scottsdale, Arizona, and licensed to do business in the State of North Carolina and through its agents, servants and employees and in the ordinary course of business, designed, manufactured, sold, distributed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, and

advertised TASER Model X-26 ECD weapon to the Village of Pinehurst and Pinehurst Police Department

## FACTS

14. On or about April 23, 2011, Ronald H. Armstrong expressed to his sister, Jinia Lopez, that he had been experiencing problems during the day.

15. Upon information and belief, Mr. Armstrong suffered from mental disabilities.

16. After conversations with his sisters, Jinia Lopez and Valerie Chriscoe, Mr. Armstrong agreed to be taken to Moore Regional First Health to seek medical attention.

17. Upon arrival at the emergency room, Mr. Armstrong was placed in an examination room where his information was being taken.

18. Upon information and belief, Mr. Armstrong left the hospital and walked across the street from Moore Regional First Health.

19. While waiting across the street, security from the hospital came over and asked Mr. Armstrong to return to the hospital.

20. Upon information and belief, Mr. Armstrong refused and began smoking a cigarette.

21. As Mr. Armstrong was sitting on the ground beside the stop sign, smoking his cigarette, officers from the Pinehurst Police Department arrived.

22. Upon information and belief, Defendant McDonald, Defendant Sheppard, and Defendant Gatling where among the officers who arrived at Moore Regional First Health.

23. Upon information and belief, Defendant McDonald, Defendant Sheppard, and Defendant Gatling began talking to Mr. Armstrong requesting that he return back to the hospital.

24. Upon information and belief, the more Defendant McDonald, Defendant Sheppard, and Defendant Gatling talked to Mr. Armstrong, the more agitated he became.

25. Upon information and belief, Defendant McDonald, Defendant Sheppard, and Defendant Gatling began beating Mr. Armstrong with their batons and choking him to remove him from the stop sign.

26. When they were not able to remove Mr. Armstrong, Defendant McDonald, Defendant Sheppard, and Defendant Gatling each began to simultaneously shock Mr. Armstrong with their taser until he fell away from the stop sign.

27. Altogether, Defendant McDonald, Defendant Sheppard, and Defendant Gatling each simultaneously shocked Mr. Armstrong at the same time in the same area of the body for a total of 5 times in increments of five seconds, eight seconds, twelve seconds, nine seconds,

and six seconds.

28. Between taser shocks, Defendant McDonald, Defendant Sheppard, and Defendant Gatling kicked, punched, frightened, and tormented Mr. Armstrong.

29. While Mr. Armstrong was still suffering from the effects of the taser, Defendant McDonald, Defendant Sheppard, and Defendant Gatling turned Mr. Armstrong over on his chest and began to handcuff him.

30. Defendant Sheppard stood on Mr. Armstrong's back with her knee as Defendant McDonald and Defendant Gatling handcuffed him.

31. Upon observation, Defendant McDonald, Defendant Sheppard, and Defendant Gatling were advised that it did not appear that Mr. Armstrong was breathing.

32. Mr. Armstrong was turned over on his back where he was found to be in acute respiratory failure and cardiac arrest.

33. Realizing that Mr. Armstrong was medically unresponsive, Defendant McDonald, Defendant Sheppard, and Defendant Gatling called for medical backup.

34. Emergency medical services were called detected that Mr. Armstrong's heart was in a state of ventricular fibrillation.

35. Attempts were made to defibrillate his heart, but the efforts were too late.

36. All of the acts described herein were performed by the Defendants in the course and scope of their employment, acting on behalf of the Pinehurst Police Department.

37. As a direct, proximate, and foreseeable result of the negligent acts and omissions of the Pinehurst Police Department and/or its agents, servants, and employees, in its usage of force and taser as complained of herein, Mr. Armstrong suffered mental and emotional injuries after being attacked by the police officers and up to the time of his death.

## FIRST CLAIM FOR RELIEF
### Negligence, Gross Negligence, and Wrongful Death Against All Defendants

38. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

39. Mr. Armstrong suffered from mental disability and therefor was protected under Federal Law and state law.

40. Defendants owed Mr. Armstrong a duty to:

   A.   Use no more force than reasonably necessary;

   B.   Protect him from harm because of his mental illness; and

C. Use the taser only when necessary and appropriate with due regard to safety.

41. Defendants violated their duty by using excessive force, failing to protect Mr. Armstrong from harm because of mental illness, and using the taser in an unnecessary and inappropriate circumstance and manner in the following ways:

   A. Failing to prohibit police officers from utilizing tasers repeatedly on a single subject;

   B. Failing to expressly and specifically prohibit police officers from deploying their tasers in unsafe ways, with certain and specific limits on amounts, durations, and locations of charges permitted to be deployed on a given person in accordance with accepted standards for safe use of the tasers;

   C. Failing to prohibit the shooting of tasers in the upper torso area;

   D. Prohibit police officers from deploying tasers in attempts to control people suffering from a psychotic break more than two times, even if the use of the taser doe not successfully subdue the Impaired Person; and

   E. Specifically limit the use of tasers in combination with other uses of force, including strikes to the head.

42. Mr. Armstrong's death was caused by the negligent actions of the Defendants.

43. The actions of the Defendants in causing Mr. Armstrong's death were grossly negligent, malicious, wanton, willful, and/or done with reckless disregard for the rights of others.

44. The actions of the Defendant police officers occurred in the course and scope of their employment and are imputed to their employer, the Pinehurst Police Department, under the doctrine of *respondeat superior*.

45. The Village of Pinehurst, acting by and through its agents, including the named police officers, was negligent in its actions on April 23, 2011. The acts of the police officers are imputed to the City of Pinehurst under the doctrine of *respondeat superior*.

46. The violations of generally accepted law enforcement custom and practice in this situation and the wrongful death of Mr. Armstrong were direct and foreseeable results of negligent hiring and retention, grossly inadequate supervisory and training policies and practices on the part of the Pinehurst Police Department.

47. Defendant The Village of Pinehurst failed to train their employees on how to properly restrain a mentally disturbed person, how to properly use a taser, the circumstances warranting use of a taser and various other restraint and arrest techniques.

48. The negligence and gross negligence of the Defendants entitle the Plaintiff to recover, in her capacity as Administratrix of the Estate of Ronald H. Armstrong, compensatory damages for the pain and suffering incurred by the decedent Mr. Armstrong after being beaten and tasered

to his death.

49. Plaintiff, in her capacity as Administratrix of the Estate of Ronald H. Armstrong, is entitled to recover from the Defendants all damages allowed by N.C.G.S. § 28A-18-2 including but not limited to medical and funeral expenses, pain and suffering, loss of services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices and advice, among other things.

50. The Defendants acted with malicious, deliberate, willful, wanton and reckless disregard of the rights and privileges of Mr. Armstrong, entitling the Plaintiff to recover punitive damages.

## SECOND CLAIM FOR RELIEF
### Action Pursuant to 42 USC § 1983 as against Defendant McDonald, Defendant Sheppard, and Defendant Gatling: Excessive Force

51. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

52. As Specifically alleged above, Defendant McDonald, Defendant Sheppard, and Defendant Gatling's actions, considering their knowledge and lack of knowledge of the circumstances, used an unreasonable, unnecessary high or dangerous level of force to subdue and/or control Mr. Armstrong, and in using more or improperly dangerous force than reasonably necessary, acted in contravention of accepted law enforcement standards related to the use of force in gaining control over unarmed individuals.

53. In inflicting greater force than reasonably necessary to control or subdue Mr. Armstrong, Defendant McDonald, Defendant Sheppard, and Defendant Gatling acted with deliberate indifference to Mr. Armstrong's Fourth Amendment Right to be free from unreasonable seizure of his person, and his Fourteenth Amendment right to substantive due process precedent to the imposition of punishment or death in response to suspected criminal activity. These rights will collectively be referred to as "Fourth and Fourteenth Amendment Rights."

54. Defendant McDonald, Defendant Sheppard, and Defendant Gatling are not entitled to qualified immunity for the constitutional violations alleged herein, due to the fact that no reasonable officer, acting in the circumstances and with the knowledge or lack of knowledge of Defendant McDonald, Defendant Sheppard, and Defendant Gatling as set forth above, would have inflicted the same type, quantity and level of force upon Mr. Armstrong as inflicted on Mr. Armstrong by Defendant McDonald, Defendant Sheppard, and Defendant Gatling.

55. Defendant McDonald, Defendant Sheppard, and Defendant Gatling's excessive use of force and corresponding deliberate indifference to his Fourth and Fourteenth Amendment Rights, proximately caused Mr. Armstrong's death and Plaintiff's damages.

56. Accordingly, Plaintiff individually on behalf of the Estate of Ronald H. Armstrong, are entitled to recover compensatory damages, punitive damages, and all other damages allowed in an amount in excess of $10,000.00.

## THIRD CLAIM FOR RELIEF
### Deprivation of Life Outside the Law of the Land, N.C. Const., Art. I, §§1,19 Against all Defendants

57. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

58. The Defendants acted in violation of N.C. Const., Art. I, §§1,19 by depriving Mr. Armstrong of his life and liberty outside the law of the land.

59. To the extent, if at all, that the Court finds the Defendant officers are entitled to immunity from state law claims of wrongful death, the Plaintiff will not have an adequate remedy at law against these Defendants. Thus, the Plaintiff brings this claim, in the alternative, under the North Carolina Constitution against Defendants in their respective official capacities.

60. The acts of Defendant McDonald, Defendant Sheppard, and Defendant Gatling, as governmental actors, were negligent in:

    A. Recklessly, wantonly, and needlessly violating standard police protocols;

    B. Recklessly, wantonly, and needlessly violating rules of engagement concerning the arrest of a mentally disturbed individual by creating an unnecessary, yet highly dangerous, exigency; and

    C. Recklessly, wantonly, and needlessly placing Plaintiff's decedent at risk of serious physical injury and/or death, in conscious disregard of known and obvious risks.

61. These negligent acts were so egregious that they exceeded the bounds of conduct tolerated by civilized society for state actors. By such wholly unjustified conduct, the Defendants took Mr. Armstrong's life in a manner that was outside the law of the land, in violation of N.C. Const., Art. I, §§1,19.

62. The Plaintiff seeks and is entitled to compensatory damages in excess of Ten thousand ($10,00) dollars, and appropriate equitable relief, on the constitutional claim.

63. To the extent, if any, that the doctrine of governmental immunity applies, the City of Pinehurst is liable for the constitutional violations of its agents acting in the course and scope of their employment.

## FOURTH CLAIM FOR RELIEF
### Action Pursuant to 42 USC § 1983 as against Defendant The Village of Pinehurst: Failure to Properly Train

64. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

65. The Pinehurst Police Department were negligent in that they failed to establish reasonable procedures, including the training of officers in methods, techniques, and approaches designed to prevent the excessive use of force in responding to situations involving

emotionally or mentally disturbed and/or restrained individuals, as well as to prevent the unnecessary arrest of mentally disturbed individuals.

66. Moreover, the violations of the generally accepted law enforcement custom and practice in this situation and the wrongful death of Mr Armstrong were direct and foreseeable results of grossly inadequate supervisory and training policies and practices on the part of the Pinehurst Police department. Defendant City of Pinehurst failed to train their employees on how to properly restrain a mentally disturbed person, or how to properly use a taser, the circumstances warranting use of a taser and various other restraint and arrest techniques.

67. Defendant The Village of Pinehurst through the acts and omissions of its employees and Defendant McDonald, Defendant Sheppard, and Defendant Gatling acted with deliberate indifference to individuals without a sense of reality and/or with an impaired ability to control their behavior ("Impaired Persons").

68. These actions of Defendants were pursuant to a municipal policy and custom and police policy and procedure and were calculated to and did deprive Plaintiff of rights and privileges protected by state and federal law, including 42 USC § 1983.

69. The Defendants acted with deliberate indifference to Impaired Persons' Fourth and Fourteenth Amendment Rights by failing to train the police officers in the following ways:

   A. Defendants failed to adequately hire, supervise and retain their police officers;

   B. Defendants failed to adequately train their police officers to employ safe, reasonable and necessary techniques designed to prevent encounters with Impaired Persons from becoming volatile or dangerous to the officers, the Impaired Persons and/or persons in the vicinity of the encounter;

   C. Defendants failed to adequately train their police officers to employ safe, reasonable and necessary techniques designed to prevent encounters with Impaired Persons who are or become volatile, violent or dangerous to the officers, to the Impaired Persons and/or persons in the vicinity of the encounter; and

   D. Defendants failed to adequately train their police officers in the safe, reasonable, effective, and appropriate modalities and measures of force to be used upon Impaired Persons.

70. The Defendants acted with deliberate indifference to the Fourth and Fourteenth Amendment Rights of Impaired Persons in their failure to train as alleged above.

71. The Defendants' deliberate indifference to the Fourth and Fourteenth Amendment Rights of Impaired Persons through their failure or failures to train as alleged above are failures of policy, widespread practice, and/or custom.

72. The Defendants' systematic training failure or failures as alleged above proximately caused Ronald Armstrong's death in that they proximately, directly and foreseeably caused Defendant McDonald, Defendant Sheppard, and Defendant Gatling to use force that was foreseeably ineffective at subduing him, instead of safely gaining control of him or simply waiting for him to tire or calm down.

73. Upon Information and belief, the Defendants knew of, ratified and/or condoned the conduct described herein.

74. Due to the systematic, unconstitutional training practices or policies alleged herein, the Defendants are liable for the Plaintiff's damages.

75. The Defendants' actions were undertaken willfully, wantonly and with reckless disregard for Plaintiff's rights, entitling the Plaintiff to compensatory and punitive damages in excess of $10,000.00.

### FIFTH CLAIM FOR RELIEF
### Negligence Against Defendant TASER: Wrongful Death Caused by Wanton, and Negligent Training

76. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

77. Defendant TASER is engaged in the business of manufacturing, distributing and selling electrical control devices ("ECD's"), including the Model X26, to law enforcement agencies throughout the United States and Canada, as well as replacement cartridges for the continuing use of the X26. Defendant TASER, designed, manufactured, sold, distributed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, and advertised TASER Model X-26 ECD weapon to the Pinehurst Police Department

78. In connection with, and to promote and encourage these ongoing sales and the use of its products, including the ongoing sales of replacement cartridges, Defendant TASER makes representations regarding the potential risks and medical safety of its ECDs, and continuously provides training and training materials for law enforcement agencies for use in instructing their officers in the safe and efficient use of TASER ECDs.

79. Defendant TASER has sold Model X-26s and replacement cartridges to the Pinehurst Police Department and has provided ongoing training materials, through the present day, in connection with those sales and sales of replacement parts such as cartridges.

80. Defendant TASER has an ongoing duty to use reasonable and ordinary care in providing truthful and up-to-date training and medical information in connection with ongoing use of its products by various law enforcement agencies.

81. Law enforcement agencies such as the Pinehurst Police Department do not independently research medical risks posed by ECDs, but instead rely on expertise, training and information provided by Defendant TASER.

82. Since the first release of its initial "Advanced TASER," the 26-watt Model M26, in late 1999, TASER represented to its law enforcement agency customers and potential customers, and to the end users of its products, that the electrical current of its ECDs is well within established safety margins, and based on extensive animal and human testing cannot affect heart rhythms.

83. Defendant TASER knew or should have known that the TASER Model X-26 has an extremely high rate of causing myocardial stimulation when the electrodes are across the chest, and that ECDS cycled for longer durations are more likely to cause ventricular arrhythmias, including potential lethal ventricular fibrillation.

84. Defendant TASER wantonly and negligently failed to modify its training, to instruct officers to "aim for center body mass," and continuing to use illustrations in their training depicting law enforcement officers shooting persons directly in the chest with ECDs, where the risk of inducing ventricular arrhythmia is significantly greater than other areas of the body. This training was relied upon by the Pinehurst Police Department and Defendant McDonald, Defendant Sheppard, and Defendant Gatling.

85. Defendant TASER wantonly and negligently failed to instruct and warn its users that the risk of an adverse cardiac event, particularly when electrodes are vectored across the heart, increases dramatically not only when the darts are vectored across the chest and the barbs are located close to the heart, but also when the duration of the pulsing electrical current is extended beyond the pre-programmed 5-second duration.

86. In addition to the knowledge of foregoing medical information, Defendant TASER continued to acquire information regarding the medical risks of ECDs with it wantonly and negligently failed to incorporate into its training programs.

87. This information includes learning of its products inducing ventricular arrhythmias, such as Greshmond Gray in La Grange Georgia, Steven Butler in Watsonville, California and Darryl Wayne Turner in Charlotte, North Carolina.

88. Because of formal experimentation, medical knowledge and actual incidents around the world, Defendant TASER:

   A. Knew or should have known that the design, manufacture, assembly, marketing and distribution of the Model X-26 was defective and dangerous;

   B. Knew or should have known that because of the defects, the weapon could not be used safely for the purposes for which it was intended; and

   C. Knew or should have known that the Defendants would use the product as it was used in the facts alleged above.

89. As a direct and proximate result of the foregoing wanton and negligent conduct of Defendant TASER in administering and updating its law enforcement training programs, Pinehurst Police Department officers Defendant McDonald, Defendant Sheppard, and Defendant Gatling were not trained on proper use of the ECD and was not trained that extending the duration of the trans-cardiac ECD current increases the danger of inducing a ventricular arrhythmia.

90. Defendant McDonald, Defendant Sheppard, and Defendant Gatling were not trained to recognize a cardiac arrest from a trans-cardiac ECD vector, or how to respond to such an event.

91. During the evening of April 23, 2011, Defendant McDonald, Defendant Sheppard, and Defendant Gatling were dispatched to Moore Regional First Health to return Ronald Armstrong to the hospital.

92. As Defendant McDonald, Defendant Sheppard, and Defendant Gatling sought to remove Ronald Armstrong from the stop sign he held onto, Defendant McDonald, Defendant Sheppard, and Defendant Gatling each pointed the TASER Model X-26 at the deceased and each shocked Mr. Armstrong at the same time in the same area of the body.

93. There were no violence or threats of violence from Ronald Armstrong.

94. Had Defendant McDonald, Defendant Sheppard, and Defendant Gatling been properly trained they would have known that using the ECD to restrain the deceased in such a frightened state in such a configuration under such non-threatening circumstances would create an unreasonable risk of cardiac arrest.

95. Had Defendant McDonald, Defendant Sheppard, and Defendant Gatling been properly trained, they would have known to use a different option to control Mr. Armstrong.

96. Due to TASER's negligent training, Defendant McDonald, Defendant Sheppard, and Defendant Gatling each simultaneously fired the ECD at Mr. Armstrong striking him in five separate places.

97. Due to TASER's negligent training, Defendant McDonald, Defendant Sheppard, and Defendant Gatling each simultaneously shot Mr. Armstrong, holding the trigger down for increments of five seconds, eight seconds, twelve seconds, nine seconds and six seconds, not understanding that Mr. Armstrong collapsed due to cardiac arrest during the altercation.

98. Realizing that Mr. Armstrong was medically unresponsive, Defendant McDonald, Defendant Sheppard, and Defendant Gatling called for medical backup.

99. Emergency medical services were called and detected that Mr. Armstrong's heart was in a state of ventricular fibrillation.

100. Defendant TASER's conduct, as alleged above, was malicious, wanton and was done in reckless disregard for the consequences on persons affected by ECD usage.

101. Defendant TASER's improper training, as alleged above, was motivated by a desire to conceal, minimize and distort the medical research regarding the risks of inducing ventricular arrhythmia because accurate representation of its products' medical risks would deter sales of the ECDs and would deter usage, which in turn would deter and lower sales of the cartridges and other replacement parts.

102. Defendant TASER owes and owed a duty to the public, including Mr. Armstrong, to establish, maintain or sufficiently enforce standards and practices which would render their tasers reasonably safe so that the use of the tasers does not deprive members of the public of their Fourth and Fourteenth Amendment Rights.

103. Defendant Taser acted negligently and with deliberate indifference to Mr. Armstrong's Fourth and Fourteenth Amendment Rights by failing to establish, maintain or sufficiently emphasize and/or enforce standards, which:

   A. Prohibit police officer users from utilizing tasers repeatedly on a single subject;

   B. Expressly and specifically prohibit police officers from deploying their tasers in unsafe ways, with certain and specific limits on amounts, durations, and locations of charges permitted to be deployed on a given person in accordance with accepted standards for the safe use of the tasers;

   C. Prohibit shooting taser charges onto or into the upper torso area; and/or

   D. Prohibit police officers from deploying tasers in attempts to control people suffering from a psychotic episode more than two times, even if the use of the Taser does not successfully subdue the Impaired Person.

104. Defendant TASER acted in deliberate indifference to individuals' including Mr. Armstrong's, rights in its failure to establish, maintain or sufficiently emphasize and/or enforce standards.

105. Upon information and believe, Defendant TASER, by and through their officers, directors and/or managers, participated in, engaged in, and/or condoned, outrageous and aggravated conduct by acting in a gross and willfully wrong manner and by engaging in reckless and wanton disregard of the Plaintiff's rights, including by consciously and intentionally disregarding and acting indifferently toward the rights and safety of others, including the Plaintiff, when these Defendants knew or should have known that their conduct was reasonably likely to result in injury, damage, harm and potentially life threatening issues with the TASER Model X-26 and the training in the usage of the same.

106. Defendant TASER's systematic indifference to establish, maintain or sufficiently emphasize and/or enforce standards as set forth herein, proximately caused the death of Mr. Armstrong.

107. Accordingly, the Plaintiff seeks punitive damages in the maximum amount allowed by law.

108. As a direct and proximate result of the wrongful conduct of Defendant TASER, as alleged above, Plaintiff's decedent, Ronald Armstrong, sustained fatal injuries resulting in his death.

109. As the direct and proximate result of the wilful and wanton conduct of Defendant, TASER, as alleged above, the Plaintiff alleges that she is entitled to recover compensatory damages and punitive damages, pursuant to Chapter 1-D of the North Carolina Statutes in an amount in excess of $10,000.00.

## SIXTH CLAIM FOR RELIEF
### Products liability (Design, Manufacture, Assembly and/or Distribution): State Law Claim against Defendant TASER International, Inc.

110. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

111. Defendant TASER designed, manufactured, assembled, inspected, tested, marketed, distributed, packaged, produced, and trained users of the TASER weapons as described herein, and received valuable consideration for its products ans services. Defendant TASER had a legal duty to protect targets of its TASER weapons, including Mr. Armstrong, from unreasonable dangers of the product. Defendant TASER breached this duty by negligently designing manufacturing, assembling, distributing, and/or marketing the TASER weapons at issue in this case, the result being an unreasonably dangerous product capable of causing injury or death.

112. Defendant TASER at all times mentioned herein, breached the express and implied warranties of merchantability and fitness for a particular purpose by selling, marketing, distributing, impliedly warranted that the TASER weapon was fit for the general purpose for which it was sold and provided. Defendants The Village of Pinehurst and Defendant Officers, reasonably relied on said warranty, and on the skill and judgment of Defendant TASER in the manufacture, design, maintenance, and monitoring of the TASER weapons at issue in this case.

113. In fact, the TASER weapon s at issue in this case were not fit for the general purpose for which they were sold or provided and were unreasonably dangerous, defective, and unsafe.

114. Mr. Armstrong died as a direct and proximate result of TASER'S negligent design, manufacture, assembly, inspection, testing, distribution, marketing, and end-suer training in connection with the TASER weapons provide to the other Defendants.

115. Defendant TASER ratified, condoned and accepted the actions and omission of its employees and staff as it did nothing to correct potentially life threatening issues with the TASER Model X-26 and the training in the usage of the same. Defendant TASER's systematic indifference to establish, maintain or sufficiently emphasize and/or enforce standards as set forth herein , proximately caused the death of Mr. Armstrong.

116. Defendant TASER's above alleged breaches of duty directly and proximately caused Mr. Armstrong's death and accordingly the Plaintiff alleges that she is entitled to recover compensatory damages and punitive damages, pursuant to Chapter 1-D of the North

Carolina Statutes in an amount in excess of $10,000.00.

## SEVENTH CLAIM
### Failure to Warn and/or Instruct on Safe
### Use Against Defendant TASER International, Inc.

117. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

118. Because of formal experimentation and because of actual incidents around the world, Defendant TASER:

   A. Knew or should have known that the design, manufacture, assembly, marketing and distribution of the Model X-26 was defective and dangerous;

   B. Knew or should have known that because of the defects, the weapon could not be used safely for the purposes for which it was intended; and

   C. Knew or should have known that the Defendants would use the product as it was used in the facts alleged above.

119. With that knowledge, in conscious disregard of the safety of the public, Defendant TASER placed this product on the market without warning customers or the unknowing public of the defects and dangers.

120. Decedent Ronald H. Armstrong, was a member of the class of people intended to be protected by the representations of Defendant Taser.

121. Defendant TASER sold the Model X-26 ECD to Pinehurst Police Department without warnings as to the effect of the darts to the front of the upper chest, which include cardiac arrest and death while also alleging that TASER hocks do not affect the cardiac rhythms of the heart.

122. Defendant TASER knew when it did so that this weapon would be sold and used without knowledge of the defects and dangers.

123. Defendant TASER, by placing the defective and dangerous weapon on the market, expressly and impliedly represented that it was safe for the purpose for which it was intended.

124. Defendant TASER sold the weapon to local law enforcement agencies including Pinehurst Police Department without adequate warning of or training in its potential for causing death when shocks are administered to the front of the chest or shocks last longer than five (5) seconds.

125. Upon information and believe, Defendant TASER, by and through their officers, directors and/or managers, participated in, engaged in, and/or condoned, outrageous and aggravated conduct by acting in a gross and willfully wrong manner and by engaging in reckless and wanton disregard of the Plaintiff's rights, including by consciously and intentionally disregarding and acting indifferently toward the rights and safety of others, including the Plaintiff, when these Defendants knew or should have known that their conduct was reasonably likely to result in injury, damage, harm and potentially life threatening issues with the TASER Model X-26 and the training in the usage of the same.

126. Defendant TASER's systematic indifference to establish, maintain or sufficiently emphasize and/or enforce standards as set forth herein, proximately caused the death of Mr. Armstrong.

127. As a direct and proximate result of the above described defects, in the Model X-26 ECD, and failure to warn, Ronald Armstrong sustained serious personal injuries and death, and the Plaintiff suffered the damages outlined herein.

128. Defendant TASER is liable to Plaintiff for compensatory damages and punitive damages, pursuant to Chapter 1-D of the North Carolina Statutes in an amount in excess of $10,000.00.

**WHEREFORE**, the Plaintiff respectfully prays the Court that:

1. That the Plaintiff have and recover judgment against the Defendants, individually and in the alternative, joint and severally, for an amount in excess of Ten Thousand Dollars ($10,000.00) in compensatory damages, together with interest as provided by law;

2. All costs of this action, including counsel fees, be taxed against the Defendants;

3. That Plaintiff be awarded punitive damages against the Defendants in their individual capacities;

4. For interest on any compensatory award from the date of the institution of this action as provided by N.C.G.S. § 24-1, and 24-5;

5. A jury trial be granted; and

6. For such other and further relief as shall be deemed just and proper.

This the 16 day of April, 2013.

Karonnie R. Truzy
NC State Bar No.: 28228
CRUMLEY ROBERTS, LLP
1810 Westchester Drive
High Point, NC 27262
Telephone: (336) 882-9898